**Daniel CASE, Appellant (Plaintiff),**

v.

**Glenn GOSS, Darrell R. "Dick" Downing, Larry Largent, Mike Hesse, Chris Schutz, Cliff Overy, Larry Mann, Bob McCaskill, George Seaman, Glenn Griggs, Appellees (Defendants).**

No. 88–247.

Supreme Court of Wyoming.

June 21, 1989.

William J. Flynn, Green River, for appellant.

John Rossetti of Greenhalgh, Bussart, West & Rossetti, Rock Springs, and Pamela L. Jacklin of Stoel, Rives, Boley, Jones & Grey of Portland, Or., for appellees.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

GOLDEN, Justice.

The district court granted summary judgment to defendants, co-employees of appellant, in this suit alleging culpable negligence. We will affirm in part, reverse in part and remand for a trial consistent with this opinion.

On August 29, 1979, appellant Daniel J. Case was permanently injured when he slipped after stepping into a hidden grease spot and fell onto the metal surface of the boom point sheave area of a dragline on which he was working at the Bridger Coal Mine. In 1983, Case brought suit against several co-employees. Following dismissal of several unserved defendants and the death of another, the remaining ten defendants, all co-employees of appellant, are Glenn Goss, Darrel R. "Dick" Downing, Larry Largent, Mike Hesse, Chris Schutz, Cliff Overy, Larry Mann, Bobby McCaskill, George Seaman and Glenn Griggs. In his complaint, Case alleged that his co-employees were culpably negligent in that: (1) they knew the boom point sheave area was dangerous due to excessive accumulations of lubricating grease and oil thrown from the dragline, but failed to inspect it; (2) they failed to report the unsafe condition of the area to their supervisors or to clean the area of such accumulations and failed to provide adequate safety devices to decrease the danger; and (3) they ordered Case to work in the area despite his numerous complaints that it was dangerous and failed to warn him of the existence of potentially hidden oil and grease spills. On July 19, 1988, the district court granted summary judgment to all defendants. On appeal, Case contends that a genuine issue of material fact as to culpable negligence of his co-employees/appellees (appellees) exists, which precludes the grant of summary judgment. Additional facts about Case's injury, organization of the mining company, positions and responsibilities of co-employees, and culpable negligence will be set forth in the analysis section as they become pertinent to the discussion.

Our standard of review of the propriety of summary judgments is well established. *England v. Simmons*, 728 P.2d 1137, 1141 (Wyo.1986). The initial burden is on the moving party to show that no genuine issue of material fact exists. *Stundon v. Sterling*, 736 P.2d 317, 318 (Wyo.1987). If movant makes that showing, the burden shifts to the nonmoving party to come for-

ward with specific facts to demonstrate the existence of a genuine issue of material fact. *Id.;* W.R.C.P. 56. In determining the propriety of any summary judgment, this court will examine the record in the light most favorable to the nonmoving party, granting him all favorable inferences which can properly be drawn from the evidence. *Wessel v. Mapco, Inc.,* 752 P.2d 1363, 1367 (Wyo.1988). "Conclusory affidavits are insufficient and specific facts must be shown." *Davenport v. Epperly,* 744 P.2d 1110, 1112 (Wyo.1987).

To recover against appellees and avoid the exclusive remedy provision of the Wyoming Worker's Compensation Act, Case must demonstrate that appellees were "culpably negligent" co-employees. W.S. 27–12–103(a) (1977);[1] *Poulos v. HPC Inc.,* 765 P.2d 364 (Wyo.1988). This court has defined culpable negligence as "willful and serious misconduct." *Stundon,* 736 P.2d at 318 (citing *Barnette v. Doyle,* 622 P.2d 1349, 1362 (Wyo.1981)). We defined the term "willful" in this context as " 'such as is done purposely, with knowledge—or misconduct of such a character as to evince a reckless disregard of consequences.' " *Bryant v. Hornbuckle,* 728 P.2d 1132, 1136 (Wyo.1986) (quoting *Hamilton v. Swigart Coal Mine,* 59 Wyo. 485, 143 P.2d 203, 206, 149 A.L.R. 998 (1943)).

The aggravating factor that distinguishes willful misconduct from ordinary negligence is the actor's state of mind. "In order to prove that an actor has engaged in willful misconduct, one must demonstrate that he acted with a state of mind that approaches intent to do harm." *Bryant,* 728 P.2d at 1136. Because the actor's state of mind may be difficult to

prove, courts allow a party to establish the existence of willful misconduct by "demonstrating that an actor has intentionally committed an act of unreasonable character in disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow." *Id.* at 1136. As we said in *Danculovich v. Brown,* 593 P.2d 187, 191, 193 (Wyo.1979):

> Willful and wanton misconduct is that which tends to take on the aspect of highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. It is not with the intent to cause injury or damage, but it must be more than mere mistake resulting from inexperience, excitement or confusion, and more than mere thoughtlessness or inadventure, or simple inattention.

> \* \* \* \* \* \*

> The intent in willful and wanton misconduct is not an intent to cause the injury, but is an intent to do an act, or an intent not to do an act, in reckless disregard of the consequences, and under such circumstances and conditions that a reasonable man would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to another. *Mitchell v. Walters,* [55 Wyo. 317, 100 P.2d 102 (1940) ].

Before we can determine whether any or all of Case's co-employees were culpably negligent, however, we must first ascertain whether each appellee had a duty to provide Case with a safe workplace and competent and sufficient employees with whom to work.[2] Ordinarily under Wyo-

---

**1.** The present Wyoming statutory provisions of the Worker's Compensation Act, W.S. 27–14–101 through 27–14–805, (June 1987 Repl.) do not provide for suits against co-employees based on a contention of culpable negligence. However, we must apply the law in effect at the time of the injury, W.S. 27–12–101 through 27–12–805 (1977), which permits maintenance of this action. *Wessel,* 752 P.2d at 1366, n. 3. The pertinent statute, W.S. 27–12–103(a), (1977) (1983 Replacement), provided:

> The rights and remedies provided in this act [§§ 27–12–101 through 27–12–804] for an employee and his dependents for injuries in-

curred in extrahazardous employments are in lieu of all other rights and remedies against any employer making contributions required by this act, or his employees acting within the scope of their employment unless the employees are culpably negligent, but do not supersede any rights and remedies available to an employee and his dependents against any other person.

**2.** The specific issues in this case require that we determine whether or not the appellees' relationship with Case was supervisory in nature, thereby imposing a duty upon them to provide

ming law it is the employer who is emburdened with the duty to provide his workers with a reasonably safe place to work and with competent coworkers. *Fraley v. Worthington,* 385 F.Supp. 605, 608 (D.Wyo. 1974); *Barnette v. Doyle* 622 P.2d 1349, 1355 (Wyo.1981). In the discharge of this duty, the employer must exercise the care and skill that a person of ordinary prudence would observe under the circumstances in furnishing employees with reasonably safe machinery, appliances, tools, and place to work, in keeping the same in reasonably safe repair, and in employing competent and sufficient employees with whom to work. *Mellor v. Ten Sleep Cattle Company,* 550 P.2d 500, 503–04 (Wyo. 1976). The ordinary rule notwithstanding, the realities of modern industry dictate that many of the legal duties owed by the employer to his employees are in fact delegated by the employer to subordinate supervisory personnel. See *Fraley,* 385 F.Supp. at 608. In this regard, Wyoming has adopted the following rule:

> An agent who, by promise or otherwise, undertakes to act for his principal under such circumstances that some action is necessary for their protection of the person or tangible things of another, is subject to liability to the other for physical harm to him or to his things caused by the reliance of the principal or of the other upon his undertaking and his subsequent unexcused failure to act, if such failure creates an unreasonable risk of harm to him and the agent should so realize.

Restatement (Second) of Agency § 354 at 125 (1958) (quoted in *Abeyta v. Hensley,* 595 P.2d 71, 74 (Wyo.1979)).

 In this case, the outer boundary of this delegated duty is defined by the additional factor that mining is considered an extrahazardous activity in Wyoming, W.S. 27–12–106 (1977), involving the use of

dangerous agencies. Persons knowingly dealing with a dangerous agency must exercise the care commensurate with the danger involved. *Pan Am Petroleum Corporation v. Like,* 381 P.2d 70, 74 (Wyo.1963). As such, the degree of care of those entrusted with the duty to provide a safe workplace is greater than under the ordinary circumstances of life or business where little or no risk is involved. This standard of care requires that every reasonable precaution suggested by experience and the known dangers of the subject ought to be taken. *Brittain v. Booth,* 601 P.2d 532, 535 (Wyo.1979).

To understand the existence and nature of the co-employees' duties owed to Case, we must examine the organizational structure of the mining company and the supervisory or authoritative roles the company bestowed upon each appellee. We must consider "evidence of the actual circumstances surrounding the arrangement between the agent or employee and the master, and the actual circumstances of injury to a co-employee in arriving at their respective definitions of duty." *Barnette,* 622 P.2d at 1355 (quoting *Abeyta,* 595 P.2d at 74). The facts about the organization of the mine are undisputed and are gathered from appellees' brief and the affidavit of appellee Seaman.

Bridger Coal Company operated the mine and employed Case.[3] The company has two distinct departments, a production department and a maintenance department. The production department operates the dragline and other equipment involved in the actual mining of coal. This department is divided into three subdivisions: coal production; drilling and blasting; and stripping. The dragline, upon which Case was working when he was injured, falls within the stripping division. Dragline supervisors report to the stripping superintendent

Case with a safe workplace. We do not mean to imply, however, that a co-employee must be in a supervisory capacity in order to be found culpably negligent. Under the culpable negligence standard, co-employees are subject in general to a duty not to endanger fellow workers by engaging in serious misconduct in reckless disregard of the consequences.

3. Although it is not entirely clear from the record, apparently all appellees were employed by Pacific Minerals, Inc., which operated Bridger Coal Company in a joint venture with Idaho Energy Resources Company.

and supervise the dragline crews, which are composed of three hourly employees who operate the dragline itself. The stripping superintendent oversees stripping and reports to the production manager.

The maintenance department consists of all employees in charge of maintenance and repair of the equipment and facilities at the mine. Case was working in this department as a field mechanic at the time of his injury. This department is divided into three groups of employees: maintenance shop employees; electricians; and field maintenance employees (including field mechanics such as Case), involved primarily with the care of and repairs to the dragline. The supervisory structure of this department parallels that of the production department, with hourly employees, like Case, supervisors, a superintendent, and a maintenance manager. The employees in the maintenance department report directly to the maintenance supervisors.

■ *Production appellees.* Five of the appellees sued were supervisors in the production department, including Downing, McCaskill, Griggs, Seaman and Mann (production appellees). The production appellees' affidavits submitted in support of their motion for summary judgment, indicated that the production department had no responsibility for the supervision, training, or assignment of employees in the maintenance department, including Case, and that none of the production appellees exercised direct supervisory control over Case on the day of his injury. The production appellees' affidavits further stated that at the time of Case's injury, four of these appellees, Downing, McCaskill, Griggs, and Seaman, were regularly assigned to production areas outside stripping and, therefore, did not work on the dragline. Mann, the fifth production appellee, although ordinarily the stripping superintendent in charge of the dragline, had been out of work for several months recovering from a heart attack at the time Case was injured.

In his affidavit in opposition to the motion for summary judgment Case argued that all supervisors at the mine, whether in the production department or the maintenance department, were responsible for safety at the mine and had the authority to tell Case what to do. He further argued that the production appellees were aware of the condition of the boom and should have taken corrective action; their failure to do so, he argued, constitutes culpable negligence because each had the supervisory authority to correct the problem. Case offered no other facts about the production appellees outside of those contained in his conclusory affidavit to rebut the production appellees' contention that they had no supervisory authority over him. Cf. *Greenwood v. Wierdsma,* 741 P.2d 1079, 1087 (Wyo.1987). Their affidavits are quite clear in delineating the organizational structure of the mining company, which shows an obvious distinction between the two departments.

Our recent decision in *Bettencourt v. Pride Well Service, Inc.,* 735 P.2d 722 (Wyo.1987), is helpful in our summary judgment review of the alleged culpable negligence of the five production appellees. Bettencourt was contacted by his supervisor and told to come to work in the evening to record flow measurements from an oil storage tank. When Bettencourt expressed reluctance to comply with his supervisor's order (he had been celebrating his birthday and had consumed alcoholic beverages), his supervisor informed him that he would not have to climb the ladder of the tank to make the recordings, as was the usual practice and a practice that Bettencourt was unfamiliar with, because there would be another employee present who could take the readings and relay them to Bettencourt who could stand on the ground below to make the recordings. Although one person could take the readings, Bettencourt decided to accompany the other employee up the tank in order to learn the procedure. A first reading was completed without incident. After taking a second reading, however, Bettencourt apparently fell to the ground as he was climbing down the ladder of the tank and was seriously injured. Bettencourt sued, among others, the supervisor who had called him into work, alleging that he was

culpably negligent in failing to adequately instruct and supervise him concerning the assigned task. On review of summary judgment favoring the co-employee/supervisor we agreed with the district court and held that the supervisor's actions, while arguably passively negligent, did not rise to the level of culpable negligence. *Bettencourt*, 735 P.2d at 729.

This case presents a similar situation for the production appellees. In their motion for summary judgment, they make a prima facie showing that the extent of their supervisory control over Case was general at best, and that no genuine issue of material fact existed from which one could infer their culpable negligence under the above standard. As in *Bettencourt*, the district court found that Case, the nonmoving party below, failed to refute that showing when the summary judgment burden shifted to him. We agree. At the time of Case's accident, the production supervisors did not have direct supervisory control over Case; their supervisory actions relating to him were passive, encompassing only a general duty to supervise and maintain a safe workplace. This does not constitute action making "it highly probable that harm will follow." *Bryant*, 728 P.2d at 1136. Nor did these appellees possess the state of mind required for culpable negligence, i.e., a state of mind approaching an "intent to harm," *Id.*, as Case admitted in his affidavit. Case's assertion that they had supervisory authority over him and therefore *could* have ordered him onto the boom is insufficient to raise their actions to the level of culpable negligence, as that phrase has been defined by this court. Case has failed to show a genuine issue of material fact that the production appellees' conduct constituted "willful and serious misconduct," *Stundon*, 736 P.2d at 318, "of such a character as to evince a reckless disregard of consequences," or "an act of unreasonable character in disregard of a known or obvious risk that is so great as to make it highly probable that harm will follow," *Bryant*, 728 P.2d at 1136, or conduct "which tend[ed] to take on the aspect of highly unreasonable conduct, or an extreme departure from ordinary care."

*Danculovich*, 593 P.2d at 191. Absent such a showing, summary judgment for the production appellees was appropriate.

The five remaining appellees are: the mine manager, Goss; the safety coordinator, Largent; a field maintenance supervisor, Overy; and two maintenance supervisors, Hesse and Schutz. We will discuss each of these appellees individually.

■ *Goss.* At the time of Case's injury, Goss was employed as the company's mine manager, primarily responsible for overseeing the development of safety procedures and safety training of mine personnel. In his affidavit in support of the motion for summary judgment, Goss stated that it was common knowledge among the employees who worked on the dragline that oil, grease, dirt and dust would accumulate in the nontraffic areas of the boom, including the boom point sheave area where Case was injured, because of the design and location of that area. Given that condition, Goss stated, employees working in that area were required to wear safety belts to prevent them from falling from the boom. Goss further stated that he was not directly supervising Case on the day of his injury and that Case had never spoken to him about the condition of the boom. He indicated that he did not believe that cleaning of the boom was necessary as he was not aware of any prior falls from grease or oil on the boom, and that even if cleaning had been necessary, any attempts to clean would have had little effect on the condition of the boom point sheave area itself where Case was injured.

In his affidavit in opposition, Case conceded that he did not know Goss before the accident and, therefore, had not spoken with him, but contended nevertheless that Goss should have been aware of and corrected the dangerous condition of the boom. Case further stated in his affidavit, however, that the only reason he sued Goss was because he felt Goss treated him inappropriately *"after"* the accident.

The affidavits reveal that before and during Case's injury, Goss was in essentially the same position as the production appel-

lees with respect to Case; he had no direct supervisory control over Case and did not intend him any harm. Goss' actions regarding Case *after* the accident, however inappropriate, cannot relate back to the accident to form the intent required to make Goss culpably negligent. Absent any record evidence from which we could draw the inference that Goss had the required state of mind, or acted in such a way evidencing a reckless disregard for Case's safety at the time of his injury, we conclude Goss' mere failure to rectify the condition of the boom before Case's injury does not create a genuine issue of material fact concerning Goss' alleged culpable negligence. Goss carried his summary judgment burden and, as with the production appellees, Case failed to refute that prima facie showing. Summary judgment for Goss was appropriate.

 *Largent.* At the time of Case's injury, Largent held the position of safety coordinator at the mine. As safety coordinator, Largent worked with the management to establish, implement and maintain safe working conditions and procedures at the mine to conform to state and federal regulations, and conducted periodic inspections of the dragline. In his affidavit, Largent detailed some of the procedures with respect to the maintenance of the dragline, indicating it was primarily the dragline crew's responsibility to clean the dragline, but that the field mechanics were responsible for cleaning their own work areas. Largent explained that the dragline was thoroughly cleaned only when the boom was brought down for major repairs, a practice that occurred infrequently due to high cost and time considerations. These thorough cleanings, Largent professed, were unnecessary for safe operation of the dragline.

Largent further asserted that the safety procedures at the mine met or exceeded industry standards and that the maintenance and cleaning of the dragline were reasonable practices to minimize the risks to those working on the dragline. He reiterated Goss' statements that the oily condition of the boom was common knowledge among the employees who worked on the dragline, that it did not seem any more dangerous than usual on the day Case was injured, that he was unaware of any previous accidents occurring on the boom due to oil, grease, dirt or dust, and that any attempts to clean the boom point sheave area would have been useless given the nature of that area. Largent admitted that Case had spoken to him about the presence of excessive oil and grease on the boom but contended that Case did not specifically complain about the boom point sheave area where he was ultimately injured. Finally, Largent alleged that he was not directly supervising Case on the day of his injury.

In his affidavit and deposition filed in opposition to appellees' motion for summary judgment, Case refuted several of Largent's assertions. First, he alleged that the safety procedures at the mine relating to the condition of the boom did not meet state or federal regulations, nor were they reasonable practices to minimize the risk of danger. In support of this allegation, Case referred to two instances in which fires occurred on the dragline due to the excessive amounts of accumulated oil and grease. After these fires, Case stated, a U.S. Mine Safety and Health Administration inspector examined the dragline and issued safety violation citations, which were discussed at a subsequent meeting attended by Case and various supervisors. As to the employees' common knowledge of the oily and greasy condition of the boom, Case asserted that the lubrication of the boom was particularly excessive about one month to three weeks before his injury, with oil and grease accumulating up to six to eight inches deep in some areas. In his deposition, Case stated that he pointed out the condition of the boom to Largent sometime before his accident and submitted a maintenance request to Largent for it to be cleaned. Instead of acting on the maintenance request, however, Case indicated that Largent ripped up the request and told Case that it was not his place to be writing such requests. Case asserted in his deposition, however, that it was the usual rule at the mine that anyone who saw a dangerous condition or situation that needed repair

was authorized to submit a maintenance request to anyone in a supervisory position.

Unlike his inadequate refutations to the showings of production appellees and Goss, these facts asserted by Case suggest a genuine issue of material fact about the culpable negligence of Largent. Largent was uniquely aware of the dangerous condition of the boom given his position as safety coordinator and Case's numerous complaints to him about it; yet, even after receiving a maintenance request from Case, Largent failed to act to remedy the situation. We can reasonably infer that Largent's destruction of the maintenance request and his failure to act may have risen to the level of an intent to not act, "in reckless disregard of the consequences, and under such circumstances and conditions that a reasonable man would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to [Case]." *Danculovich*, 593 P.2d at 193. Summary judgment for Largent was inappropriate given these circumstances and is reversed.

■ *Hesse.* On the date of Case's injury, Hesse had been employed as a maintenance supervisor at the mine for approximately one month and was primarily in charge of the shop welders in the maintenance department. Although he occasionally supervised the field maintenance crews, in his affidavit he specifically denied any direct supervisory responsibility over Case on the date of his injury. He further denied any responsibility for cleaning the boom. He reiterated Goss' and Largent's assertions that the employees were commonly aware of the dangerous condition of the boom, that it was not more dangerous than usual on the day of Case's injury, that the design of the boom point sheave area subjected it to accumulations of oil and grease, and that attempts to clean it would have no effect.

In response to Hesse's summary judgment showing, Case alleged that he had numerous conversations with Hesse about the condition of the boom before his injury and even discussed different kinds of safety harnesses that might be safer than the one in place, and the use of skid resistant flooring that could be installed in the particularly greasy areas. Case contends that Hesse responded to this offered information in a vulgar manner [4] and did not act on or implement his suggestion. Case stated further that he asked Hesse if he could clean the area, but that Hesse refused to allow him to do so, alleging there was not enough time and that Case was being paid too much money to be cleaning the boom instead of doing his normal duties; Hesse allegedly further refused to give Case the tools necessary to clean. Finally, Case directly refuted Hesse's contention that Hesse was not in fact supervising him on the day of his accident.

Again applying the appropriate standard of review, we hold that Case refuted Hesse's prima facie summary judgment showing and established genuine issues of material fact as to Hesse's alleged culpable negligence. From his inaction as to Case's suggestion about improved safety measures, his knowledge of the condition of the boom and his vulgar response [5] to Case's request to clean the boom, we can draw the reasonable inference that Hesse's conduct may have risen to the level of an intent to not act, "in reckless disregard of the consequences." *Danculovich*, 593 P.2d at 191, 193. Hesse's specific knowledge of the condition of the boom and his subsequent failure to take any corrective action indicate a potential reckless disregard for Case's safety. Summary judgment for Hesse is reversed.

■ *Overy.* Overy was employed as a field maintenance supervisor at the time

---

4. Specifically, Case alleged that Hesse responded, "Next you're gonna want a net underneath the fucking boom, just like a circus."

5. Under the applicable standard of review, Hesse's vulgar response in itself is insignificant; standing alone it could not prove his culpable negligence. However, in light of Hesse's other conduct, which is sufficient proof of a reasonable inference of culpable negligence under the standard to preclude summary judgment, we believe the vulgar response is simply further evidence of whether Hesse's conduct may have risen to the level of culpable negligence.

Case was injured. Although he admitted in his affidavit that he was ordinarily responsible for the direct supervision of field mechanics, including Case, he alleged that he was not present at the mine on the day in question. From this he argued that he was not in a position to affect Case's activities on that day. He further denied that he had any conversations with Case about the condition of the boom. The remainder of his affidavit mirrors that of Hesse in alleging common knowledge of the dangerous condition of the boom, that it was no more dangerous than usual, that he was not aware of prior accidents, that the design of the boom invited accumulations of grease and oil, and that attempts to clean it would be of little or no help.

Case raised several significant facts in refutation. He first asserted that the day before his accident he made an offer to Overy to clean the boom; Overy refused to allow him to do this for the same reasons that Hesse refused him permission. Next, he contended that he spoke with Overy many times about the dangerous condition of the boom. When Case explained how dangerous he believed the boom to be and told Overy that it needed cleaning on a day sometime before his injury, Case charged that Overy threatened to fire him if he did not climb the boom and do his job. Finally, Case alleged that Overy was the one he was in the most contact with regarding the boom, and that he was very familiar with the condition of the boom.

In light of Case's numerous complaints about the dangerous condition of the boom, Overy's threat to fire Case is alone sufficient to raise a genuine issue of material fact whether Overy was culpably negligent that should properly be decided by a trier of fact. Summary judgment favoring Overy is reversed.

■ *Schutz.* At the time Case was injured, Schutz was working as a maintenance supervisor responsible for the employees working on the drills and shovels. Although his supervisory responsibilities were generally limited to those employees, Schutz admitted that he was supervising Case on the day of his injury. Schutz denied having had conversations with Case about the condition of the boom arguing that field maintenance employees were required to clean their own work areas. As to the events occurring on the day of the accident, Schutz explained that immediately after Case was injured, he spoke with him in the shop and asked if he wanted to go to the hospital for medical assistance; he asserted Case indicated that he did not want to go. Schutz further alleged that he was a trained emergency medical technician and had adhered to his training in assessing Case's need for immediate medical care.

In his affidavit in opposition, Case contended that sometime before the accident date he complained to Schutz about the condition of the boom and expressed his fear of working on the boom due to the accumulations of oil and grease. Like Overy, Schutz threatened to fire Case if he did not climb the boom to complete his duties and ordered him to climb the boom despite his knowledge that the boom was dangerous. Case also alleged, in direct contradiction to Schutz's assertion, that Schutz denied him the opportunity to seek medical attention immediately after his injury and again on the following day, threatening to fire him if he did so.

Schutz's actions in ordering Case to climb the boom despite Case's complaints about its condition and in threatening to fire him if he refused to climb the boom or seek medical attention for his injuries combine to raise a genuine issue of material fact whether Schutz was culpably negligent. Whether Schutz's actions were reasonable under the circumstances or constituted a willful or reckless departure from ordinary care raises a genuine issue of material fact that must be submitted to the jury. Summary judgment favoring Schutz was improvidently granted in this case.

In conclusion, we agree with the trial court's determination that Case failed to raise a genuine issue of material fact on the culpable negligence of appellees Downing, McCaskill, Seaman, Griggs, Mann and Goss. However, we reverse the summary judgments granted to appellees Largent,

Hesse, Overy and Schutz, and remand the case against those appellees for a trial.

Affirmed in part, reversed in part and remanded.

THOMAS, Justice, concurring and dissenting.

Because I perceive the appropriate application of our case rules to this situation somewhat differently than the majority of the court, I dissent in some respects and concur in others. I am satisfied that the court is correct in affirming the summary judgment in favor of Downing, McCaskill, Griggs, Seaman, and Mann. I also agree with the majority disposition with respect to Largent, Hesse, and Schutz. However, I cannot agree with its posture as to Goss and Field Maintenance Supervisor Overy. Differing from the majority, I would reverse the summary judgment as to Goss, and I would affirm the summary judgment in favor of Overy.

Succinctly, I understand that a co-employee can become liable for culpable negligence in connection with an injury to an employee in three ways. The co-employee can engage in affirmative activity that is unreasonably dangerous. As I perceive that basis for liability, it is not alleged in this case. A co-employee can be responsible for the maintenance of a working condition that is unreasonably dangerous. That is the basis on which I would reverse as to Goss and agree to reverse as to Largent. In the instance of each of these co-employees, the record does structure genuine issues of material fact. Thirdly, a co-employee, as a supervisor, can affirmatively direct an employee to encounter an unreasonably dangerous condition. I agree that there exist genuine issues of material fact with respect to whether Schutz and Hesse, in specifically supervising Case's activities on the day of his injury, directed him to encounter an unreasonably dangerous condition. Overy, as I understand the record, had no responsibility for the dangerous condition of the boom in the sense that he had authority to correct it. If the co-employee is not responsible for the maintenance of the working condition that is unreasonably dangerous because he has authority to correct the condition, then he cannot intend anything simply because he is aware of the condition. On the day in question, Overy did not direct Case's activities. The summary judgment as to him should be affirmed.

I would add only that it seems inappropriate to rely upon vulgar language, the tearing up of equipment reports, the refusal to entertain complaints, or post-injury conduct because, in my view, none of those events could have any causal relationship to Case's injury.